Reginald L. ALLEN,

and

Earl Lomax, Plaintiffs,

v.

David J. BARRAM, Defendant.

Civil Action No. 99–2271(JMF).

United States District Court, District of Columbia.

Aug. 23, 2002.

James Lester Kestell, Kestell & Associates, Falls Church, VA, for Plaintiff.

Paul A. Mussenden, U.S. Attorney's Office, Washington, DC, Sonia M. Orfield, U.S. Department of Health and Human Services, Washington, DC, for Defendant.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

A jury returned a verdict in favor of the plaintiffs,[1] who complained that their not being selected for the position of Physical Security Specialist was the result of racial discrimination. This case is therefore now in the remedy phase with the court obliged to determine what back pay they are entitled to and whether they should now receive the Physical Security Specialist positions that were given to others.[2]

The government, however, seeking to deny plaintiffs any remedy whatsoever, renews an argument it made at trial. It had pressed me unsuccessfully to instruct the jury that they could not return a verdict for plaintiffs if they found that plaintiffs would not have gotten the jobs even if the jury found that their not getting the jobs was the product of racial discrimination in the first place. To understand why I rejected that argument at trial one has to understand the process that led to the incumbents' selection and the plaintiffs' rejection.

Plaintiff Earl Lomax, Jr., ("Lomax") had worked for the Federal Protective Service as a uniformed police officer for 29 years when he applied for the position of Physical Security Specialist. Tr.[3] at 35. Plaintiff Reginald Allen ("Allen") had been with that Service since 1996 when he applied for the same position. Tr. at 172. From 1991 to 1996, Allen had served as a uniformed police officer in the Defense Protective Agency, protecting the Pentagon. Tr. at 174.

The Physical Security Branch tries to improve all aspects of building security in federal buildings by focusing on, for example, alarms or surveillance equipment. The Enforcement Branch, on the other hand, engages in the more traditional policing functions of patrolling federal buildings and responding to alarms. The plaintiffs were attracted to the possibility of advancement in the Physical Security Branch. As members of the Enforcement Branch, their career path ended at a GS–9 while as members of the Physical Branch they could advance to GS–12. Tr. at 45. Indeed, when plaintiffs testified at trial in 2001, the incumbents, who started as GS–7's in the Physical Security Branch had already advanced to GS–12. Tr. at 121.

The process culminating in the incumbents' selection began with the publication of a vacancy announcement. Plaintiffs submitted the required documents and a personnel specialist, Mary Jo Clark, then matched these submissions against a job analysis and crediting plan created by the Federal Protective Service. Clark testified that this plan "would tell me exactly what knowledge, skills and abilities a person would have to have in order to be eligible for this position." Tr. II at 25.

---

1. Plaintiffs are African–Americans.

2. I will call the two individuals who got the positions "incumbents."

3. "Tr." is a reference to the transcript of the trial.

In this instance, the knowledge, skills, and abilities for the Physical Security Specialist position were:

1. Knowledge of physical security principles;
2. Ability to gather data and draw conclusions;
3. Ability to establish priorities; and
4. Ability to communicate orally and in writing

Tr. at 51.

Clark examined the applicants' submission to compare what appeared in those submissions to these four criteria. If there was, in Clark's view, a match between something in the applicant's submission and any of the criteria, the candidate received credit; if there was not, Clark disregarded it. Tr. II at 41. She specifically testified that she disregarded the applicants' years of experience as a police officer. Tr. II at 41. As a result, there was a remarkable leveling of the applicants' credentials for the new job. Of the thirteen who applied, Clark found nine who were qualified for the position. She was obliged to rate them on a scale of 1 through 4 and all nine got the same grade, 3. The net effect of this was that plaintiffs' years on the job gained them nothing in Clark's eyes. Indeed, Lomax, with 29 years of experience, got the same grade as one incumbent who was a trainee when she applied for the job. Tr. at 86.

Clark sent the nine names on to John Bates ("Bates"), then Director of the Federal Protective Service, who could have chosen anyone on the list. Tr. II at 136. Bates, however, assigned his assistant to convene a three person panel to interview the nine applicants. The panel convened, interviewed the applicants, and graded them solely on the basis of their answers to four interview questions.[4]

The interview process yielded cumulative scores for each applicant that were the sum of the scores given each applicant by each panel member. The job went to the highest scorer, an African–American named Spencer. Bates, however, wanted to create additional positions in the Physical Securities Branch and, therefore, his assistant created two more positions. Applicable regulations permitted Bates to fill those positions with names from the nine-person list, provided he acted within 90 days of his selection of Spencer. Tr. II at 135–137. Bates then chose the next two highest scorers, Dunham and Fitzgerald, whom I have called the incumbents, for the two new positions. As I have noted, the incumbents, who are white, were remarkably junior to plaintiffs. Dunham was a trainee and Fitzgerald had one year in grade when selected; Lomax had 29 years experience with the agency when Bates selected the incumbents. Plaintiffs fared poorly in the interview process that became, by default, the sole criterion for selection because Bates testified that he did not make an independent review of the documents the applicants had submitted but simply went down the nine person list, having totaled the scores given him by the interview panel. Tr. II at 136. On that list, plaintiff Allen was last and plaintiff Lomax was next to last.

At the conclusion of the trial, the agency tendered an instruction that would have had me tell the jury that it could not return a verdict for plaintiffs even if they found that their non-selection was the product of racial discrimination, if they also found that they would not have gotten the jobs in any event. Pointing to the list,

---

4. At trial, plaintiffs challenged three of the questions as not job related, even though they claimed that, under a collective bargaining agreement, the criteria for selection and the agency's own merit policy had to be job related.

the agency insisted that even if the incumbents, Dunham and Fitzgerald did not get the jobs, there were still five candidates who scored higher than Lomax and Allen who would have gotten the jobs even if the incumbents had not.

I rejected that argument, concluding that if the jury were to find that the process that resulted in the selection of the incumbents was tainted by a discriminatory animus the results of that process could not justify denying plaintiffs relief. I stated:

> How can a process which a jury finds explicitly to discriminatory and unfair be used to justify the result that they wouldn't have gotten the jobs anyway because the process collapses under their attack?

Tr. III at 230.

■ As I noted above, the government has renewed the argument but now uses it to claim that plaintiffs are not entitled to the incumbents' jobs despite the jury's verdict in their favor. But, I remain as convinced now as I was at trial that the very process found by the jury, either implicitly or explicitly, to have been discriminatory cannot now be used to deny the plaintiffs' relief. Congress could not have possibly intended that a jury would find that an employer discriminated against a plaintiff by using a particular manner or method to fill a vacancy and that the very manner or method would then become sufficient grounds upon which to deny the plaintiff relief.

Indeed, I permitted counsel to question the jury after their verdict. One juror explained to counsel that the jury believed that the process of selecting the incumbents was so irrational that it permitted the conclusion that it was based on the incumbents' race. That perceptive comment underlines how completely unjust it would be to permit a process the jury explicitly found to be discriminatory to be used to deny plaintiffs' relief.

Additional consideration of this question since the trial convinces me of the correctness of my views. I am certain that the agency is confusing two very different types of cases. In the first, the plaintiff claims racial discrimination but the defendant shows that, for example, she had an undisclosed felony conviction for embezzlement that would have disqualified her for the position she sought as, let us say, a bank teller. That case is a far cry from this one. No one is pretending that plaintiffs were unqualified for the positions they sought. Indeed, the agency found them qualified. Since they were qualified, there was no predicate for a jury conclusion that they would not have gotten the jobs even if the process culminating in their rejection had not been tainted by discrimination. To have instructed the jury as the government urged me would have been to invite them to commit a terrible injustice: permitting the result of a process found by the jury to have been tainted by discrimination to be a sufficient basis for denying relief to the victims of that very discrimination.

Any analysis of the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) and of its Congressional overturning underlines the error of the agency's reasoning.

In *Price Waterhouse*, Hopkins, the female plaintiff, had established to the fact finder's satisfaction that sexual stereotyping had infected the determination to place her application to become a partner on hold. Nevertheless, there was also evidence of deficiencies in Hopkins' interpersonal skills; she was described as "overly aggressive, unduly harsh, difficult to work with and impatient with staff." *Price Waterhouse v. Hopkins*, 490 U.S. at

235, 109 S.Ct. 1775. Understandably, Price Waterhouse defended on the ground that Hopkins would not have become a partner in any event, whether or not she was a victim of sexual stereotyping.

The Supreme Court divided over the allocation of the burden of proof as to this issue, with no opinion commanding a majority. Justice Brennan's opinion indicated that if Price Waterhouse could establish by a preponderance of the evidence that Hopkins would not have made partner that year even if it had permitted "sex linked evaluations to play a part in the decision-making process," *id.* at 255, 109 S.Ct. 1775, it could prevail. Justice O'Connor, concurring, related Price Waterhouse's burden to Hopkins' proof. Since, in Justice O'Connor's view, Hopkins presented "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion," defendant then had the burden of proving that the decision "would have been justified by other, wholly legitimate considerations." *Id.* at 278, 109 S.Ct. 1775. If a plaintiff failed to produce such evidence, the burden remained on the plaintiff to establish that the employment action was taken because of discrimination with the understanding that plaintiff could use the familiar burden shifting of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.*

Whatever holding emerged from all of this became of academic interest two years later when Congress amended Title VII of the Civil Rights Act by the Civil Rights Act of 1991. One section of the latter, codified as 42 U.S.C.A. § 2000e–2(m)(1994) provides:

> **(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices**
>
> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

A second, complimentary provision provides:

> **(B)** On a claim in which an individual proves a violation under section 2000–e2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—
>
> > **(i)** may grant declaratory relief, injunctive relief (except as provided in clause *(ii)*), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and
> >
> > **(ii)** shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

42 U.S.C.A. § 2000e–5(g)(2)(B)(1994).

Thus, under the statutory regime that supplanted the opinions in *Price Waterhouse,* the respondent who establishes that it would have taken the same action in the absence of the impermissible motivating factor does not escape liability, but only certain forms of relief. The statute provides no support for the agency's contention here. Since the process that led to the ranking of the candidates was found by the jury to be the product of racial discrimination, the ranked list cannot then be used to establish that persons ranked higher than plaintiffs on the list would have been promoted ahead of them. It would be as if Price Waterhouse, having used a process tainted with sexual stereotyping to produce a list of nine candidates for partnership in which Hopkins placed last, justified not making her a partner in

the face of a finding that the list itself was a product of sexual stereotyping. Surely, no statute can possibly be read to allow for the use of the product of the very discrimination established, to justify the refusal to grant relief to the victim of that discrimination.

Since it is impossible and unfair to use the process that the jury found discriminatory to deny the plaintiffs the remedies they seek, the question becomes how to shape the relief to which they are entitled. The overarching principle is that, as a matter of statutory command, the plaintiffs are entitled to be put in the position they would have been had they not been victimized by the discrimination the jury found to exist. *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 762, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); Hopkins v. *Price Waterhouse*, 920 F.2d 967, 976 (D.C.Cir. 1990), *aff'd on other grounds*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Lander v. Lujan*, 888 F.2d 153, 155 (D.C.Cir.1989). Indeed, the Supreme Court has indicated that a complete remedy, including back bay, promotion and seniority can be denied only "for reasons which, if applied generally would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). That principle shapes the discretionary process that requires the court to consider all pertinent factors without forgetting that its central obligation is to undo the discrimination the jury found to have existed.

There are three alternatives. First, the process could be undone and a new selection done under judicial supervision. Second, plaintiffs could be given the jobs the incumbents got at the entry level, GS–7. Third, as plaintiffs demand, they could be given the positions the incumbents now have. As noted earlier, the incumbents have advanced substantially since getting the jobs; they are now GS–12's. Plaintiffs insist that they be advanced to the GS–12 positions immediately and be given, as it were, retroactively, the training the incumbents received in the years since their selection so that plaintiffs are as capable as the incumbents of performing the responsibilities of the GS–12 positions.

The first alternative—a new selection under judicial supervision—is the least attractive. First, no source of law provides any direction to the court as to how the process should be conducted and creating a new process is literally unprecedented. Second, it is particularly intrusive of the agency's personnel management; it substitutes an uninformed judicial role for a well-established personnel policy that must be in accordance with equally well-established agency and Office of Personnel Management regulations.

Most significantly, I find the declaration of Andre Jordan, the new Director of the Federal Protective Service, who would make the ultimate decision if a new selection was to be done, troubling. Jordan states: "While I am committed to maintaining a workforce free from discrimination and that values workplace diversity, the drain on employee morale and FPS resources will be significant if the most competitive candidates realize that skill and ability to compete for the position is not as important as suing." Declaration ("Decl.") at 3. Jordan therefore has already determined that plaintiffs have some how "cheated the system" by seeking to enforce their rights rather than relying on their skills. His arrogant contempt for the jury's verdict is striking.

Additionally, in 2000, plaintiffs applied again for a GS–7 Physical Security Specialist Position. Jordan selected three individuals who, he says, were "head and

shoulders" above the rest. Decl. at 2. The rest included, of course, plaintiffs. Jordan then proceeds to demean the abilities of plaintiffs, finding their scores in the 2000 process "demonstrably inferior to the selectees" *Id.* He concludes that "Allen and Lomax do not deserve PSS positions based on their scores." *Id.* Thus, Jordan has as much contempt for plaintiffs' abilities as he does for the jury's verdict. To send them back to a process culminating in Jordan's ultimate decision is to send them back to a process whose result is pre-ordained; they will never get the jobs as long as Jordan is there. Surely, this is sending the sheep to be shorn and I will not demean the jury's verdict by sending these plaintiffs back down a road that leads to such an obvious dead end.

■ Plaintiffs are therefore entitled to the jobs they sought. I have to note that I do not consider displacing the incumbents in itself any impediment to ordering the defendant to give plaintiffs the incumbents jobs. In this Circuit, "bumping" incumbents is an appropriate remedy for disparate treatment discrimination if the finder of facts determines that it was motivated by a discriminatory animus. *Lander,* 888 F.2d at 156. *See e.g. Hayes v. Shalala,* 933 F.Supp. 21, 24 (D.D.C.1996); *Underwood v. District of Columbia Armory Board,* 1992 WL 36545 * 3 (D.D.C. Feb. 10, 1992); *Jones v. Rivers,* 732 F.Supp. 176, 179 (D.D.C.1990)(all authorizing "bumping" incumbent as Title VII remedy). *See also Doll v. Brown,* 75 F.3d 1200, 1204 (7th Cir.1996)("No one has a *right* to occupy a position that he obtained as a result of unlawful discrimination, even if he himself was not complicit in the discrimination."). I would gladly consider some alternative that granted plaintiffs complete relief without displacing the incumbents.

*See Lander,* 888 F.2d at 159 (Ginsburg, R. J., concurring). Unfortunately, the government takes the stark position that plaintiffs are entitled to no equitable relief whatsoever, meaning, I take it, that the jury trial and verdict were, in its view, meaningless. Without even a suggestion of an alternative acceptable to the agency, I am afraid that I cannot rescue it from its own extremism.

There is, of course, another group of individuals who might have a somewhat more legitimate complaint about plaintiffs' advancing to the GS–7 position—the other applicants who scored higher than plaintiffs did in the 1997 selection process. But, as I have taken pains to point out, a selection process determined to be discriminatory can confer no entitlements or rights upon anyone, lest the jury verdict be nullified. That these other applicants scored higher than plaintiffs in the process condemned by the jury's verdict is of little moment. I note as well that American history teaches that progress in the Civil Rights movement was a direct function of the courage of the people who demonstrated or registered to vote while their churches were being bombed and their children and leaders killed. Granting a benefit (if that is what it is) to plaintiffs who expended time and money to assert their right not to be discriminated against and withholding that benefit from those who did not assert those rights fulfills the intention of the Civil Rights Act of 1964 in a perfect and poetic way. Furthermore, while all analogies limp, the courts have favored those members of a class who brought the lawsuit and served as class representatives against other members of the class who benefit from the suit but did not commence it when doing so advanced some important interest.[5] Granting these

---

**5.** *See generally* Herbert Newberg & Alba Conte, *Newberg on Class Actions,* § 11.38 (1992).

plaintiffs benefits not granted to other potential selectees who did not sue at all is, if anything, doing less than that.

■ The tougher nut to crack is whether, like the incumbents, these plaintiffs should be given the GS–12 positions the incumbents have achieved since their selection in 1997 with the understanding that they be given as quickly as possible, the training the incumbents have had since their selection.

Doing so requires the assumption that the progress of the plaintiffs would be the same as the progress of the incumbents and, superficially, that seems speculative. The law likes to think that it condemns speculation unilaterally. In truth, many exercises in legal reasoning, particularly at the remedies phase of a case, are by nature probabilistic and, in that more accurate sense, speculative, since an arithmetic or lapidary answer is simply unavailable. A more honest analysis appreciates that the only answer is a probabilistic one that has to be judged on his reasonableness, even though those fond of labels will naively condemn it as "speculative." Without hesitation, the law estimates the life time earnings of a baby who dies one day after being born. Ascertaining whether two men would or would have not have achieved what two other individuals did in a particular job is surely a less intimidating and less "speculative" exercise.

The most significant tool available to the court in such an exercise is the allocation of the burden of proof. I will grant the devil his due and allocate to plaintiffs the entire burden of proving to my satisfaction, by a preponderance of the evidence, that plaintiffs would have achieved a GS–12 level had they been selected in 1997. I find that they have met that burden for the following reasons.

First, the positions at issue were entry level. Absolutely no experience, education, or knowledge was required. Indeed, all the applicants received a "3" score prior to the interview, despite the extraordinary differences in their experience levels. The personnel specialist explained that this was due to the entry level of the position. Tr. II at 43, 94. Thus, the incumbents cannot claim some expertise that plaintiffs lack.

Second, I had the benefit of hearing and seeing these plaintiffs testify and they struck me as competent, articulate, and dedicated law enforcement officers. As I have noted, they both had excellent records at the FPS without a single black mark against them. To the contrary, their superiors thought highly of both of them. I cannot, for no good reason, assume that they would have failed to achieve what the incumbents, officers of less experience, have achieved.

Third, support for plaintiffs's assertion that they would have achieved a GS–12 position by now comes, ironically, from Jordan's declaration. Jordan points out that two of the eleven physical security specialists had their promotions delayed. Decl. at 4. But, Jordan sees the glass as 20% percent empty; I see it as 80% full. Nine of the eleven specialists advanced meaning that plaintiffs had a 9 in 11 chance of advancing as well. A probability factor that high easily makes their advancement more likely than not.

I appreciate that the interest in enforcing the Civil Rights Act, like any interest, might not be absolute and would have to be weighed against the potential danger posed to the physical security of the buildings for which the agency is responsible by the promotion of an incompetent. There is also the interest, that I have already acknowledged, in diminishing unnecessary judicial intrusion into personnel matters.

As to the latter, I have noted that Allen has left the FPS to become a Metropolitan Police Department officer. While I cannot

be certain, I think it unlikely that he will desert that career opportunity and return to FPS. If I am right in that supposition, Allen may be content to accept the back pay I am awarding him and remain where he is, meaning that only one of the two incumbents will have to be displaced.

As to plaintiff Lomax, he now has 33 years of law enforcement experience and a distinguished record as a police officer. In his case, the judicial obligation to enforce the Civil Rights Act trumps whatever interest there may be in the preservation of the institutional integrity in personnel matters if the jury's verdict is to have any meaning. I cannot possibly see him as an incompetent whose promotion will threaten in any way the FPS's mission. I find Jordan's assertion in his declaration to the contrary to be hyperbolic and utterly unjustified.

### The Court Intends to Enter Final Judgment

By separate order, I intend to enter final judgment for plaintiffs in this case as soon as possible. Relief will consist of the following:

1. Back pay;
2. Compensatory damages which the jury awarded in the amount of $38,000 for Allen and $46,000 for Lomax;
3. An order requiring the promotion of plaintiffs to a GS–12 Physical Security Specialist position forthwith, with the agency required to provide them, as soon as possible, with all necessary training to perform that position at that level and at least with the training provided the incumbents to date.

The parties filed a Joint Stipulation Regarding Back Pay on December 18, 2001. By a separate order, I am directing them to file a revised stipulation indicating the back pay due plaintiffs as of September 6, 2002. I intend to enter final judgment on the next business day.

I appreciate that the agency has indicated that it would file a motion for judgment of law or for a new trial but I have waited months for it and it has not come. I have determined to enter final judgment now. I have waited long enough.

### ORDER

The parties having filed a *Joint Stipulation Regarding Back Pay* on December 18, 2001, and the court being desirous of entering final judgment forthwith, it is therefore, hereby,

**ORDERED** that the parties file, by September 6, 2002, a revised Joint Stipulation Regarding Back Pay, indicating the back pay due plaintiffs as of September 6, 2002. The court intends that the parties simply carry forward the arithmetical calculations from December 18, 2001 to September 6, 2002.

**SO ORDERED.**