**Reginald ALLEN and Earl Lomax, Plaintiffs,**

v.

**Stephen A. PERRY, Administrator, U.S. General Services Administration, Defendant.**

**Civil Action No. 99–2271 (JMF).**

United States District Court, District of Columbia.

Sept. 4, 2003.

---

James Lester Kestell, Kestell & Associates, Falls Church, VA, for plaintiff.

Paul A. Mussenden, U.S. Attorney's Office, Sonia M. Orfield, U.S. Department of Health and Human Services, Washington, DC, for defendant.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

In this opinion, I resolve and deny *Defendant's Renewed Motion for Judgment as a Matter of Law, Motion for New Trial and Motion to Alter or Amend Judgment.*

The defendant contends that plaintiffs' discrimination case should not have gone to the jury and that the Court made evidentiary rulings that justify setting aside the verdict.

## INTRODUCTION

In an earlier opinion,[1] I reviewed at length how plaintiffs showed a remarkable discrepancy between their experience, documented capabilities, supervisory appraisals, and the decision made to not select them.

---

1.  *Allen v. Barram,* 215 F.Supp.2d 184 (D.D.C.  2002).

## Plaintiffs' Evidence

First, the personnel specialist who rated the applications of the candidates for the position disregarded plaintiffs' experience as police officers. Instead, she testified that, because the position being filled was a Grade 7, at the trainee level, she determined that the amount of prior experience was irrelevant. Transcript ("Tr.") II at 43. In this sense, "all of their [the applicants'] backgrounds were the same." *Id.* Hence, as I pointed out in my earlier opinion:

> As a result there was a remarkable leveling of the applicants' credentials for the new job. Of the thirteen who applied, Clark [the personnel specialist] found nine who were qualified for the position. She was obliged to rate them on a scale of 1 through 4 and all nine got the same grade, 3. The net effect of this was that plaintiffs' years on the job gained them nothing in Clark's eyes. Indeed, [plaintiff] Lomax, with 29 years of experience, got the same grade as one incumbent who was a trainee when she applied for the job.[2]

*Allen,* 215 F.Supp.2d at 186.

Second, plaintiffs' evidence, if credited by the jury, established deviations from sources that were supposed to control the selection made. First, the vacancy announcement indicated that the applicant should supply with his application a certain form (GSA form 3413), a "Supervisory Appraisal of Demonstrated Performance." Tr. I at 47. A supervisor was to rate the applicant's demonstrated performance or potential to meet the four quality ranking factors that would be used in assessing the applicant's qualifications. Tr. I at 48–49. The four factors were:

1. Knowledge of physical security principles
2. Ability to gather data and draw conclusions
3. Ability to establish priorities
4. Ability to communicate orally and in writing

Plaintiffs submitted the form from their supervisors. Lomax's supervisor gave him a four on each factor, a perfect score. Tr. I at 54. Allen's supervisor gave him a 15 out of 16. Tr. I at 178. One of the incumbents,[3] however, did not even submit the form and the other got a score that was lower than plaintiffs, but was chosen nevertheless. Tr. I at 80, 83.

Third, the applicable 1997 merit selection plan required that the selection be on the basis of merit, fitness, and qualifications, and premised "solely on job related criteria." Tr. I at 118. The four interview questions were:

1. Why do you want this job and why should you be chosen?
2. What is the most difficult decision you ever made that turned out wrong and what did you do about it?
3. What are your strengths and weaknesses?
4. Who in your life has impressed you the most and why?

Tr. I at 183–86.

Since all the applicants entered the interview process with the same score of 3, as an assessment of their qualifications, achievements, and backgrounds, the interview process became the exclusive means of rating the applicants. The members of the rating panel so testified, indicating either that they did not even look at the

---

2. In fact, the plaintiffs trained her but she got the position instead of them. Tr. I at 90 and 190.

3. As I did in my earlier opinion, I use the word "incumbent" to mean the two white officers who got the jobs plaintiffs sought.

applicants' applications or, if one of them did, they all nevertheless based their rating solely on how the applicants responded to the four questions. Tr. II at 198, 211 and Tr. III at 73. Plaintiffs testified that three of the four questions were not job-related. They also insisted that the rating panel's ultimate evaluation of them was based solely on their ability to express themselves orally and focused entirely and, therefore, improperly on only one of the four criteria of knowledge, skill, and abilities identified in the Vacancy Announcement. Similarly, plaintiffs contended that exclusive reliance on the applicants' responses to the four questions violated a provision of a collective bargaining agreement that required interview questions to be job-related. Tr. I at 104–5. Plaintiff Allen, who had been president and vice president of the union that represented the employees of the Federal Protective Service (Tr. I at 71) also testified that the agreement required the submission of a supervisory appraisal of demonstrated performance or potential performance for any vacancy and the agency's acceptance of one incumbent's (Fitzgerald's) application, that did not include such an appraisal, was a violation of the agreement. Tr. I at 106–7.

Finally, plaintiffs offered the testimony of the Assistant Chief of Police, Don Waldon, who served as Special Assistant to John Bates, the Director of the Federal Protective Service. Bates made the selections that the plaintiffs challenged. Waldon testified that he heard Bates say at one of the weekly staff meetings that "he was going to diversify the agency" and that Waldon understood him to mean that "he was changing the agency along racial and ethnic lines." Tr. I at 244–45. The Federal Protective Service had a predominantly African–American work force at the time to which Waldon referred.

### The Government's Evidence

The government met the plaintiffs' case at every point, producing testimony that race was irrelevant to the ratings, that an African American was selected, that the personnel specialist's rating of all the applicants' qualifications as the same was fair and reasonable, that the position did require oral communication skills, that the questions were job-related, and that there was, therefore, no violation of the merit plan or the collective bargaining agreement. Finally, Bates testified that after he selected Spencer, the African American, for the position and learned that he could fill two more positions, he took the two applicants who had the next two highest scores on the list the rating panel had created when it ranked the applicants after their interviews. Tr. II at 133–38. That these two people were white had nothing to do with their selection because their selection was simply a matter of arithmetic based on the scores of an objective ratings panel that plaintiffs conceded did not consider race in arriving at those scores. Tr. II at 138.

### The Government's Argument

Although the competing cases created genuine issues of material fact that only a jury could resolve, the government nevertheless insists that the verdict should be set aside and the court should have granted the motions to dismiss it made at the conclusion of the plaintiffs' case and at the conclusion of all the evidence.

### The Insignificance of Spencer's Selection

As to the motion made at the conclusion of the plaintiffs' case, it is important to realize that, whatever argument the government makes now, the only arguments it made at the conclusion of the plaintiffs' case was that the selection of Spencer, an African American, defeated plaintiffs' *pri-*

*ma facie* case. Tr. II at 9.[4] As a variation on that theme, the government also relied on cases in which an employment decision, whether a selection, promotion, or transfer, involved several people. According to the government, the presence of members of the protected class within the group of persons who gained an advantage from that employment decision in itself defeats the claims of discrimination by a member of that same protected class. Tr. II at 10. The government also made the analogous argument that, since plaintiffs did not and could not challenge the selection of Spencer or the process that resulted in his selection as discriminatory, they could not claim that the same process that yielded the selection of the two white incumbents was discriminatory as to them. Tr. II at 10.

█ But, after the trial, the D.C. Circuit Court of Appeals held "that a plaintiff in a discrimination case need not demonstrate that she was replaced by a person outside her protected class in order to carry her burden of establishing a *prima facie* case under *McDonnell Douglas*." *Stella v. Mineta*, 284 F.3d 135, 146 (D.C.Cir.2002). The government's argument to the contrary and the authorities upon which it relied at trial and now in its motion[5] do not survive that decision.

█ Second, I do not know why Spencer's selection in itself defeats *ipso facto* any claim that the process that resulted in the subsequent selection of the two white incumbents was discriminatory. That a process yields the selection of an African American does not somehow sanitize for all times the use of that process when it results in the selection of white persons who, plaintiffs show, have appreciably less experience and fewer qualifications than the African Americans who are not selected. At the time Louis Brandeis was admitted to Harvard Law School, anti-semitism was said to affect that law school's admissions in that there were quotas on the number of Jews that could be admitted. That Brandeis overcame that anti-semitism to be admitted and then lead his class hardly means that other Jews who did not get admitted to Harvard were not victimized by anti-semitism. Whether any Jew not admitted was discriminated against is a function of the comparison of that person's qualifications with the qualifications of any gentile who was admitted. That Brandeis was admitted has nothing to do with that comparison.

Identically here, that Spencer did so well in his interview that he got the job does not mean that other African Americans who did not do as well were not victimized by discrimination on the basis of their race. It is the central teaching of *Stella* that one cannot proceed mechanically from the selection of an African American for one of several positions to the proposition that no other African American

---

4. The Court: So you are continuing to rely on the argument that there is no *prima facie* case here because Spencer was selected; is that your argument?

Mr. Mussenden: And I think the court—the Circuit Court's opinions support that view, Your Honor.

Tr. II at 9.

5. *E.g., Ball v. Tanoue,* 133 F.Supp.2d 84, 86 (D.D.C.2001); *Ramsey v. Derwinski,* 787 F.Supp. 8, 11 (D.D.C.1992); *Simens v. Reno,* 960 F.Supp. 6 (D.D.C.1997). Note that in each case the District Court held that the selection of someone within the protected class defeated *ipso facto* the claim of any other member of that protected class from claiming the selection was discriminatory. Those decisions did not survive *Stella* and the government's continued reliance on them (*see Memorandum of Points and Authorities in Support of Defendant's Motion for Judgment as a Matter of Law, Motion for New Trial and Motion to Alter and Amend Judgment* at 15) is misplaced.

could have possibly been discriminated against in the process that lead to the selection of that one African American. To conclude that, because one African American was selected, that process could not possibly have been discriminatory as to any other African American is *non sequitur*. Indeed, a moment's thought indicates that it would place a blessing on tokenism; selection of one member of a protected class would insulate the selection from attack by any other member of that class, no matter how just her claim of discrimination.

It must be recalled that plaintiffs' burden, said to be light, was only to show that, as was admitted, they were qualified and members not of their protected class, two white incumbents, were selected for the two vacancies. *Cones v. Shalala*, 199 F.3d 512, 518 (D.C.Cir.2000)("For purposes of the *prima facie* case, however, it is sufficient that Cones has established that he was substantively qualified and that HHS selected a white person."). They easily meet that burden once Spencer's selection for the first position is eliminated for the irrelevancy the decision in *Stella* makes it.

### The Controlling Legal Standard

■ The government would be entitled to have the verdict set aside and judgment entered in its favor only if no reasonable person could have found that plaintiffs' race was a motivating factor in their not being selecting for the positions they sought. 42 U.S.C.A. §§ 2000e–16 (1994); 2000e(m)(1994). The court is prohibited from weighing the evidence or assessing the credibility of the witnesses; those are jury functions. If fair-minded persons could differ as to the conclusion, or if there is substantial conflicting evidence, the motion must be denied. *Carter v. Duncan Huggins, Ltd.,* 727 F.2d 1225, 1228 (D.C.Cir.1984). *Accord McNeal v. Hi–Lo*

*Powered Scaffolding Inc.,* 836 F.2d 637, 640–41 (D.C.Cir.1988).

### The Significance of *Aka* and *Reeves*

■ More particularly, in this Title VII action involving a challenge to a selection, the cases of *Aka v. Washington Hospital Center,* 156 F.3d 1284 (D.C.Cir.1998)(en banc) and *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) are controlling. Under those cases, if plaintiff makes out a *prima facie* case and defendant produces a legitimate reason for the action taken, disbelief of that reason ordinarily suffices to permit the case to go to the jury. *Reeves,* 530 U.S. at 146–47, 120 S.Ct. 2097; *Aka,* 156 F.3d at 1291–94. Both cases posit, of course, that there may be cases in which such disbelief will not suffice. Thus, the question presented is whether plaintiffs presented sufficient evidence to permit a reasonable person to find that the stated reason for the selection of the incumbents is not true.

■ The government argues that the process was free of discrimination and yielded a result that was premised on the simple arithmetic of who received the highest scores in the interviews. But, the process cannot be viewed in isolation from whatever internal deficiencies affected it nor from the legitimacy and fairness of the result it achieved.

As to the process itself, plaintiffs' evidence first established that from its inception it purposefully disregarded the applicants' prior experience and leveled the playing field to such a remarkable extent that the two incumbents were remarkably junior to the plaintiffs when they were selected. Indeed, it is hard to exaggerate how junior. Surely, it is a rare case where an employer disregards seniority and practical experience to such an extent that, as occurred to Lomax, he lost a job to a

person who was his junior by 28 years. A process that begins by eliminating all seniority is so counter to human experience and the ordinary practice of the federal government that, at a minimum, a juror could have sufficient reason to doubt its legitimacy.

Second, plaintiffs presented evidence that there was a deviation from the merit selection plan and the collective bargaining agreement in that both required that the selection be made using job-related criteria. Plaintiffs also showed that one person who got the job did not comply with one of the requirements specified in the collective bargaining agreement. While the government met that evidence by challenging whether there were such deviations from the controlling documents and challenged whether they were even controlling, there was certainly a genuine issue of material fact as to whether the four questions asked of the applicants were truly related to the criteria set out in the vacancy announcement as to the knowledge, skill, and abilities required for the position.

Third, all the interviewers agreed that they based their scores solely on the interviews. That exclusive reliance meant that one of the four criteria became the only criterion for selection. Again, the distance between what the vacancy announcement said—four criteria would be used—and what the government did-one criterion was used—certainly raised a genuine issue of fact as to the whether the process actually used was legitimate.

Fourth, *Aka* dealt with a comparison of qualifications between individuals without any indication of a racially discriminatory animus. In this case, viewing Waldon's testimony in the light most favorable to plaintiffs, there was evidence [6] that the

selecting official expressed the goal of diversifying a predominantly African–American workforce. When the selection in this case yielded two white selectees who were remarkably junior to the plaintiffs, a jury certainly had the basis to disbelieve Bates's assertion that he choose the incumbents by a simple arithmetic process. Whether the comment Waldon attributed to Bates is viewed as direct evidence of discriminatory animus or as reason to disbelieve Bates's testimony is of little moment. What is important is that it certainly was evidence that created a genuine issue of material fact as to Bates's true intentions.

Finally, while *Aka* dealt with the comparison of two applicants for a position, the merit selections procedures applicable to federal government employment are based on a process. As *Aka* indicates, the selection of a person who is less qualified is sufficiently counter-intuitive to permit a jury to reject the employer's assertion of a legitimate reason behind his selection. *Aka*, 156 F.3d at 1293–94. When a process yields a similarly counter-intuitive result, the same logic prevails. Thus, the government's argument that the agency used a neutral process, one free of discrimination, to arrive at the result does not carry the day. A jury may find the results of a process so illogical as to permit it to question its professed *bona fides*. In this case, there was the added dimension of deviations from the requirements of the process to which plaintiffs pointed, such as: (1) the use of only one of the four criteria to arrive at the final score; (2) the claimed deviations from the collective bargaining and merit protection plan in asking what plaintiffs claimed were questions that

---

**6.** Note that Bates never specifically denied making the statement that Waldon attributed     to him.

were not related to the job criteria; and (3) the consideration and ultimate selection of one applicant who plaintiffs claimed failed to meet a fundamental requirement of applying for the position.

A final point. Throughout its well-written Memorandum, the government, as it did at trial, keeps insisting that, because its witnesses denied any racially discriminatory intent and the process they used was arithmetical, it was and is now entitled to judgment. That position consistently ignores how narrow the question presented is. It is not whether the government's witnesses had good and sufficient reasons for everything they did or did not do with reference to the selection of Spencer and then the two incumbents. It is whether plaintiff presented sufficient evidence to permit a reasonable person to disbelieve the government's explanation and then draw the inference, permitted by *Aka* and *Reeves,* that the real reason was discrimination.

### Evidentiary Rulings

In its motion, the defendant points to two instances where evidence was admitted over its objection and insists the admission prejudiced it to the point of warranting a new trial. In each instance, plaintiffs pointed to evidence that tended to show a racially discriminatory animus. In the first, the decision maker was challenged with another selection he made that plaintiffs suggested indicated that he favored a Caucasian over an African American. In the second, the plaintiff challenged a pay discrepancy between the payment made to Spencer, the African American who got the job, and the two white Americans who got it. When, however, all the testimony is collected as to these two instances, it is clear that there was no error in the admission of the evidence as to the two instances and, in any event, the full explication the jury heard as to both instances eliminated whatever prejudice the defendant could possibly claim.

### The Selection of the Chief of Police

■ On direct examination, John W. Bates, who was Director of the Federal Protective Service and therefore made the selections at issue in this case, was asked about the first selection he ever made in his position as Director. It was for the position as Chief of Police. A man named David Mahmoud, a Caucasian, was acting Chief of Police. Tr. II at 148. When plaintiffs' counsel asked whether a second vacancy announcement was issued after Mahmoud applied for the permanent Chief position, defendant's counsel objected "under 404(b)." Tr. II at 148. The Court indicated that it would "let him [plaintiff's counsel] go a little further, then we'll see where we go." Tr. II at 148–49. Bates then explained that, after he reviewed the applications made for the position advertised by the vacancy announcement, "we" [*i.e.,* he and Ann Everett] conducted interviews but decided that none of the applicants had the requirements he required. He then announced the position once again, with the understanding that the applicants who had responded to the first vacancy announcement would be considered without having to re-apply. This process yielded two lists, one of which was a veterans preference list that contained an individual, a Caucasian, whom Bates favored. The government renewed its "404(b) objection," and the Court overruled it. Tr. II at 150. When Bates was challenged by being asked whether he could not select the Caucasian on the veterans preference list because two African Americans were rated higher, Bates admitted that he could not offer the position to his choice because the African Americans were ranked higher on the veterans

preference list. Tr. II at 150. He then explained why he choose Mahmoud:

> He [Mahmoud] was basically always the first choice as, you know, the in-house candidate. And when we could not get basically the individuals with additional qualifications we were looking for, we chose to go ahead with Mr. Mahmoud rather than announce a third, or a fourth, or even a fifth time which would leave the position in a kind of limb for a long period of time. You have to have somebody that makes those decisions.

Tr. II at 151.

When Bates was then challenged as to whether he took into account "at all that the African–Americans had ranked higher on the veterans sheet" (Tr. II at 151), he responded:

> We had four candidates total that were down to the last wire, okay? There was Dave Mahmoud and the individual on the veterans list. There were two other individuals from the second list. Ms. Ann Everett and I basically interviewed those candidates again, and both of us came to the conclusion that the gentleman on the veterans list was the best qualified.

Tr. II at 151.

After Bates indicated that he had interviewed the four candidates, including the two African Americans, plaintiffs' counsel went on to another topic. Defendant's counsel, however, returned to the topic of Mahmoud's selection on re-direct. He first had Bates explain that Ann Everett, who assisted Bates in Mahmoud's selection, was African American and concurred in Bates' selection of Mahmoud. Tr. II at 164–65. This inquiry led the Court to inquire of Bates whether the preference that veterans receive requires their being listed on a separate list, reserved for veterans. Bates explains that indeed there were two lists, one for veterans and one

for everyone else. Bates called the latter "the status list" and explained that Mahmoud and the two African Americans were on the status list while the candidate he and Everett preferred was on the veterans list. There were, therefore, four finalists for the position: Mahmoud, the Caucasian candidate Bates and Everett preferred, and the two African Americans. Of these four, only the Caucasian could claim a veterans preference. Tr. II at 166–67. When Bates and Everett chose him, however, the personnel officer reminded them that there were veterans on the veterans preference list who had a higher preference score than their candidate and he could not be selected. Tr. II at 169. Thus, with their choice undone, Bates and Everett went back to where they started from and chose Mahmoud:

> So then we went back and said, "Okay. Now take a look at the other three candidates again." And since Ms. Everett and I, in a sense had ranked the other candidates with Mr. Mahmoud basically as number one, he's in-house, he'd been doing the job for almost over a year. So basically, we chose to go to him.

Tr. II at 169.

Thus, thanks to this questioning, the jury got a complete explanation from Bates of why he chose Mahmoud and did not choose the competing African Americans.

After the testimony, the Court inquired of defendant's counsel whether this testimony suggested other discriminatory acts by Bates and defendant's counsel indicated that was what plaintiff's counsel was suggesting. When the Court pressed defendant's counsel as to what other bad acts it suggested, defendant's counsel responded that the jury may not understand Bates' testimony. Tr. II at 180. At that point,

the Court asked plaintiffs' counsel why he had elicited the testimony and plaintiff's counsel responded that he had offered it "just to show that when he had a choice between African–Americans and Caucasians ... [i]n the first selection he made, he chose Caucasian." Tr. II at 181. He insisted that he did not offer it to show another bad act of racial discrimination. When plaintiff's counsel agreed with the Court that plaintiffs offered it because it bore on motive or intent, the Court said to defendant's counsel:

Okay. Now, if you would like me to give a specific instruction to the jury in light of that, I will be glad to consider doing so.

Tr. II at 181.

Defendant's counsel responded:

We're not requesting that. It's just that like I think in that case [7] the Court mentioned, a sufficient tie usually is required because it's presumptively inadmissible under 404(b) and there are certain exceptions including motive, intent and other things mentioned under that section, and because of that, having that aired in front of the jury, ultimately it may be relevant, but that to ferret that out, we'd like an opportunity to do that outside the presence of the jury. And we're only asking that if that occurs, that we approach.

Tr. II at 182.

Thus, the record reflects that defendants' counsel specifically declined the opportunity to have the jury instructed as to the significance of Bates's testimony and asked only that it be permitted to argue outside of the presence of jury the admissibility of any other evidence that tended to show acts of discrimination other than those charged. The only objection ever made was a reference to 404(b) but defendant's counsel never answered the Court when it inquired what other bad act Bates's testimony showed.

It is hard to understand from the transcript what ruling the Court made that the defendant preserved for post-trial review since it did not identify what error the Court was making in its ruling and specifically declined to offer an instruction as to the significance of Bates' testimony and asked only to have the Court consider the admissibility of any similar testimony before the jury heard it.

In any event, whether or not the defendant preserved the point for subsequent review, none of Bates' testimony warrants granting a new trial. First, the only objection the defendant made was based on the portion of Rule 404 of the Federal Rules of Evidence that *admits* the evidence.

On the other hand, taking the defendant's best case, that the Court was wrong and Bates's selection of Mahmoud was a prior bad act of discrimination, it was admissible. As the defendant has to concede, it is settled beyond all question in this Circuit that other acts of discrimination, identical to the kind of discrimination charged, are admissible under Rule 404(b) to prove motive or intent. *Morgan v. Federal Home Loan Mortgage Corp.*, 197 F.R.D. 12, 16 (D.D.C.2000); *White v. U.S. Catholic Conference*, 1998 WL 429842 *5 (D.D.C. May 22, 1998). If, on the other hand, the selection of Mahmoud was not a prior act of discrimination, and therefore not subject to the constraints of Rule 404(a), it was relevant as bearing on the motive or intent with which Bates acted when he selected Mahmoud. This further supports the argument that Bates was

---

7. During the colloquy, the Court reminded counsel of Judge Spotswood Robinson's concurrence in *Miller v. Poretsky*, 595 F.2d 780 (D.C.Cir.1978).

similarly motivated in favor of Caucasian applicants when he chose the incumbents in this case. In any event, defendant's counsel abandoned having the jury instructed as to the significance of Bates' testimony and cannot raise it now.

Finally, whether or not the defendant preserved the point, the Court did not abuse its discretion in admitting the evidence. Bates' testimony had substantial probative value because it was related to another instance of potential racial discrimination in the filling of a position by the same person who made the selection at issue in this case. There was no risk of unfair prejudice to the government since Bates was permitted by the Court's questioning to give the fullest possible explanation for the selection he made, thereby rebutting any claim that he was motivated by racial animus. He was also permitted to explain that Everett, an African American, shared his views of the qualifications of the four finalists and agreed with his ultimate selection. It was for the jury to then decide whether or not Bates' explanation of his selection of Mahmoud was or was not racially motivated. Finally, even now, the defendant does not claim that there was risk whatsoever that Bates' explanation of his choice of Mahmoud confused or misled the jury. The brief inquiry counsel and the Court made was hardly a lengthy digression from the issues in the case.

### The Pay Disparity

■ Plaintiffs' counsel elicited testimony from defendant's witnesses that it appeared that after the selection process was completed and the incumbents chosen, the Caucasians selected received more pay than the African American who was selected. Whatever benefit plaintiffs tried to get out of this was obliterated by the testimony of Ora Schackelford, an experienced personnel management specialist

who began working for the government in 1968. She carefully explained that the persons who made the selection had no involvement in determining how the incumbents were paid and that her review of the documents indicated that the disparity was the product of an error made by a personnel specialist who processed the paper work after the selection was made. Tr. III at 106. She also explained that the error was in the process of being corrected. Tr. III at 10.

Having heard this testimony and seen the careful way in which Ms. Schackelford explained and conceded the error from the documents she was shown, I am certain that it is inconceivable that any reasonable juror would find any merit to the contention that the pay disparity was evidence of racial discrimination. Thus, the defendant was not prejudiced by the receipt of this evidence. More to the point, the defendant never really bothers to explain what rule of evidence was violated by the admission of the initial evidence that tended to show a disparity in the way in which the incumbents were paid. Is the defendant suggesting that evidence that African Americans are paid less than Caucasians for doing the same job is not evidence of racial discrimination?

### The Testimony of Don Waldon

At the pre-trial conference, it appeared that Don Waldon would not be present at the trial, and the defendant's counsel indicated that he would object to the admission of any portion of Waldon's deposition transcript in which Waldon expressed an opinion as to the meaning of a remark Bates made at a staff meeting. Tr. Pre-trial Conference at 30. Waldon, however, did appear for trial and a *voir dire* was held before Waldon was permitted to testify. At the *voir dire*, after Waldon testified as to his understanding of what Bates meant when he indicated at a staff meeting

an intention to diversify the hiring process, the Court inquired of defendant's counsel what his objections were. Counsel responded: "Well, our objection was twofold. One was relevance and one was foundation." Tr. I at 235. When the Court pointed out that it was obviously relevant that Bates had uttered a statement that bore on a potential discriminatory intent and the foundation was that Waldon heard Bates utter the words, the defendant's counsel said: "Right, and that would be an admission of a party opponent, and we have no objection to that. Tr. I at 235". He then stated:

> The objection is, is in asking the witness's response of his understanding of the word "diversification" he said "itself" has—that is different from a understanding of what Bates meant. There's been no foundation laid as to what—his personal knowledge as to what Bates actually meant.

Tr. I at 236.

The Court responded:

> Concededly, he can testify, as can any witness, to what he heard. Whether or not the conclusion he draws from that is or is not an appropriate one remains to be seen by the jury and remains to be attacked by your cross examination.

Tr. I at 236.

As noted above, and as anticipated, at trial Waldon testified that he heard Bates say that "he was going to diversify the agency" and that he understood Bates to mean that "he was changing the agency along racial and ethnic lines." Tr. I at 244–245. Then, as the Court predicted, defendant's counsel cross examined Waldon that Bates never explained what he meant when he used the word "diversify." Tr. I at 246. Counsel then got Waldon to admit that he did not believe that Bates' remark had any bearing on the selection process at issue in this case. Tr. I at 248–49.

Defendant now argues that the receipt of this testimony warrants a new trial. While the only argument made *in limine* was the lack of foundation, defendant's counsel now says that "[a]s argued *in limine*, such an opinion is inadmissible under the 2000 amendments to Fed.R.Evid. 701." *Memorandum of Points and Authorities in Support of Defendant's Renewed Motion for Judgment as a Matter of law, Motion for New Trial and Motion to Alter or Amend Judgment* at 33. But, as the transcript makes clear, defendant never relied on the Rule 701 when arguing the motion *in limine*. Even if it did, that Rule permits a witness to express an opinion that is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Waldon's opining what Bates meant was based on what he heard and surely bore on a relevant fact, Bates' intent when he made the selections at issue. Waldon's testimony was clearly admissible. *United States v. Valdez–Torres*, 108 F.3d 385, 388 (D.C.Cir.1997)(lay person may express opinion as to intent with which other person acted).

Finally, making another argument it never made *in limine*, defendant invokes Rule 403 in insisting that Waldon's testimony should not have been admitted. It then cites, in support of this statement, cases that distinguish statements that are evidence of discriminatory intent from those involving "stray remarks." But, defendant never made this argument when it argued the motion *in limine*; to the contrary, as I have explained, it conceded the relevancy of Waldon's testimony. It is too late in the day to shift ground now. Similarly, defendant cannot possibly argue now that the Court abused the discretion con-

ferred by Rule 403 to decline to admit relevant evidence when it never invoked that discretion in the first place. Fed. R.Evid. 103(a)(1).

### Collective Bargaining Agreement

■ In the period from 1994 to 1998, plaintiff Lomax was Vice President of the American Federation of Government Workers local that represented the employees in the agency in which he worked. Tr. I at 71. At some point in the latter part of 1998 he became president. *Id.* He had been active in the union for 20 years. *Id.* During the trial, his attention was directed to the collective bargaining agreement that indicates that the selecting official is responsible for insuring that the interview questions used during a selection process were job-related and that "a supervisory appraisal of documented performance or potential performance should be submitted by applicants for vacancies announced under the plan." Tr. I at 106. The agreement also required that "[t]he form may be completed by the applicant's supervisor or any other former supervisor." *Id.*

Lomax then testified that Fitzgerald's selection violated the provision requiring the submission of the form because Fitzgerald did not submit one. Tr. I at 107. He was then asked how it affected him that the questions asked of him were not, "in his opinion", not job-related. *Id.* Lomax replied that the questions placed him at an unfair disadvantage because, had the questions been job-related, he would have scored much higher. *Id.*

The government answered this testimony by calling Edward P. Denney, the Director of the Labor Relations Division of the GSA. Denney, an attorney, testified that he was the chief negotiator for the GSA in the negotiations with the union, of which Lomax had once been vice-president and president, and that it was these nego-

tiations that culminated in the collective bargaining agreement to which Lomax had referred. Tr. III at 30–32.

His attention was drawn to the provision in the agreement that Lomax insisted required the submission of "the supervisory appraisal of documented or potential performance" by all applicants. Tr. III at 33–34. He insisted that submission of the form was not mandatory but optional. He then testified that (1) the selecting official could delegate the interviewing of the applicants to a panel, and (2) the selecting official could select any candidate from the best qualified list. Tr. III at 36. Returning to the form, he testified as follows:

> Question: Getting back to the supervisory appraisal, would a candidate—if a candidate was rejected for failing to submit a supervisory appraisal, would that be a violation of the collective bargaining agreement?
>
> Answer: That would not be consistent to reject a candidate for simply not filing an optional form.
>
> Question: So even if a candidate did not include that, according to the collective bargaining agreement, that candidate should still have an opportunity to be evaluated.
>
> Answer: Oh, yeah. That's an optional form, so assuming everything else is proper, then simply not having that form would not be a reason to exclude that candidate.

Tr. III at 36–37.

Therefore, the government answered from a most qualified source Lomax's contention that Fitzgerald's not submitting the form should have disqualified him.

Whether Lomax could testify as to the significance of the collective bargaining agreement first arose at a hearing devoted to consideration of the defendant's motions *in limine*.

The government demanded "under 104 that plaintiff show a proffer, give the preliminary fact, as to whether or not a violation occurred". Motion Hearing ("MH") of August 20, 2001 at 44. The government further stated, "And we would have testimony, depending on what comes in, to prove that, we'd have testimony to rebut it." *Id.* Plaintiff's counsel then explained the deviations from the agreement upon which he was relying and indicated that he intended to argue that deviations from the agreement were proof of discriminatory intent. MH at 44–47. When government counsel demanded "a proffer as to who will testify to prove this," plaintiffs' counsel responded, "Both plaintiffs." MH at 47. Government counsel then argued that plaintiffs were not qualified to testify as to the collective bargaining agreement being violated and that they should not be permitted to so testify without evidence that it was. I overruled the objection. When government counsel insisted that the threshold of relevance couldn't be established unless the witness was qualified to say that a violation had occurred, I responded:

> My point is these plaintiffs are third-party beneficiaries of this agreement and have formed, correctly or incorrectly, some understanding of its terms and its obligations and they are going to testify, as I understand it, why they believe that the procedure required by the agreement was deviated from. You have the perfect right to cross examine them to show them that was not true and to present a rebuttal witness showing that there was no violation. I just don't understand why we have to do that—why we should do that in advance of the testimony being heard. It's like any other evidence. It comes in subject to—it comes in, I mean, I think it meets—their testimony that there was a deviation from the collective bargaining

agreement is relevant even if it's incorrect; in other words, I don't understand why you want me to make a preliminary determination that their interpretation is wrong. I am not the finder of fact; the jury is.

MH at 48–49.

When government counsel persisted that there was no foundation for the plaintiffs' potential testimony regarding a violation of the collective bargaining agreement, I indicated:

> Well, I still believe that I know of no principle of law that precludes me from giving—from precluding a witness to give testimony merely because his opponent can show that it's [in]accurate, and I think that's really where we are.

MH at 50.

In its post-trial motion, the government portrays itself as renewing its objection to the evidence and demanding the right to *voir dire* the witness and "to approach to challenge this evidence outside of the presence of the jury." *Response to Court's Order Regarding Citations in Defendant's Renewed Motion for Judgment as a Matter of Law, Motion for New Trial and Motion to Alter or Amend Judgment* at 4 (citing Tr. I at 93). But, at the portion of the transcript, all government counsel said was "Can we take him (Lomax who was testifying about the collective bargaining agreement) on voir dire, or can we approach." Hence, at no point, did government counsel demand any right to challenge Lomax's testimony outside of the presence of the jury. It is equally untrue that "the Court denied the request to approach to consider voir dire outside the jury's presence." *Defendant's Renewed Motion for Judgment as a Matter of Law, Motion for New Trial and Motion to Alter or Amend Judgment* at 4 (citing Tr. I at 93). I did no such thing. All I denied was

the application to approach the bench; I had no idea that government counsel was insisting that the *voir dire* I then permitted be done outside the presence of the jury. Hence, the government's first claim of error—that I denied it the right to *voir dire* Lomax concerning the collective bargaining agreement—is simply untrue. The only application it ever made pursuant to Rule 104, the rule that requires preliminary questions regarding a witness's qualifications to be held outside of the presence of the jury when justice so requires was made at the pre-trial hearing when it invoked the rule to demand that plaintiff proffer whether a violation of the collective bargaining agreement occurred. It got that proffer moments later when plaintiffs' counsel stated that plaintiffs would testify as to the violation. Defendant never again invoked Rule 104 and certainly did not invoke it at the trial when Lomax testified.

Finally, as to the substantive question presented, I persist in my view that Lomax, a union official, could testify as to why he believed the collective bargaining agreement had been breached. He was, after all, testifying about a document the jury had in front of it, and I am hard pressed to understand why I had any right to seize from that jury the determination of whether or not Lomax's interpretation of it was or was not correct.

### Conclusion

*Defendant's Renewed Motion for Judgment as a Matter of Law, Motion for a New Trial and Motion to Alter or Amend Judgment* are denied. An Order accompanies this Memorandum Opinion.

### ORDER

Pursuant to the accompanying Memorandum Opinion, it is, hereby,

**ORDERED** that *Defendant's Renewed Motion for Judgment as a Matter of Law,* *Motion for New Trial and Motion to Alter or Amend Judgment* [# 64] is **DENIED.**

**SO ORDERED.**